## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Darcey Duncan, | Case No. |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED UNDER FRCP 38(b)** |
| Richard Duncan, in both his individual and official capacities as Chisago County Sheriff; and Chisago County, | |
| Defendants. | |

For her Complaint, Plaintiff Darcey Duncan ("Darcey") hereby states and alleges as follows:

1.     This is an action for money damages against the Defendants for the grave constitutional harm Darcey suffered when former Chisago County Sheriff Richard Duncan ("Duncan") used his final policymaking authority to fabricate evidence so he could sexually assault and otherwise victimize her.

2.     "I'm the Sheriff.  I'll protect you."  Defendant Duncan used statements like this to intentionally violate Darcey's Fourteenth Amendment right to bodily integrity.

3.     Duncan is sued in both his individual and official capacities for misconduct he committed while acting under color of state law.

4.     Darcey brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourteenth Amendment to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(a)(3).  The aforementioned statutory and constitutional provisions confer original jurisdiction of this Court over this matter.

5.     As Darcey's claims arise purely under federal law, state-law claims and, by consequence, any limitations and defenses available under state law are not applicable to this civil-rights lawsuit.

6.     Venue is appropriate in this Court under 28 U.S.C. § 1391, as a substantial part of the events giving rise to Darcey's claims occurred in this District.

7.     Darcey currently resides in Chisago County, Minnesota, and she resided there at all times relevant to this lawsuit.  She is a United States citizen.

8.     At all times relevant to this lawsuit, Duncan lived and worked in Chisago County.  He is a United States citizen.

9.     Defendant Chisago County is a political subdivision of the State of Minnesota with a principal location of 313 N. Main Street, Center City, MN 55012.

10.     Duncan was elected Chisago County Sheriff in the fall of 2010 after over 20 years with the Minneapolis Police Department.

11.     His tenure as the chief law enforcement officer for Chisago County ended on May 4, 2018.

12.     On April 25, 2018, shortly before his retirement, Duncan admitted he was the author of fabricated communications to a Chisago County employee. That victim's name is Michelle Jacobson ("Jacobson").  Duncan was looking for a sexual relationship with Jacobson and threatened her safety and the safety of her family if she did not comply.

13.     Before preying on Jacobson, however, Duncan abused his authority as Sheriff to prey on another victim:  his sister-in-law, Darcey.

14.     Duncan used the power of Chisago County to violate Darcey's constitutional rights.  He wore his Chisago County uniform and drove a Chisago County squad car during the encounters at issue in this lawsuit.

15.     On or about April 1, 2017, Darcey received a text message from Duncan telling her that they needed to talk about something important.

16.     In April 2017, Duncan was the Chisago County Sheriff.  His stated and widely known plan was to run for reelection in the November 2018 election.

17.     Duncan's campaign and other reelection activities were underway in April 2017.

93054113.1

18.     Duncan used his position as Sheriff (as only he could) to fabricate evidence of criminal activity and thereby engage in a pattern of violating Darcey's constitutional rights.

19.     After sending the initial text message, Duncan went to Darcey's house in Stacy, Minnesota.

20.     The City of Stacy is in Chisago County.

21.     The City of Stacy does not have its own police department and instead is serviced by the Chisago County Sheriff's Office.

22.     Duncan's instructions to Darcey included a mandate that they meet when her husband and her oldest son were out of the home.

23.     Duncan wore his Chisago County Sheriff uniform and drove his Chisago County squad car to Darcey's home.

24.     During this initial meeting, Duncan told Darcey that the two of them were being blackmailed by some criminal.  Unbeknownst to Darcey, that "black mailer" ended up being Duncan.

25.     Sheriff Duncan told Darcey that the black mailer was leaving anonymous letters in his mailbox.

26.     He brought at least one letter with him.

27.     Duncan told Darcey that the black mailer wanted the two of them to act like they were having an affair.

93054113.1

28.     Duncan told Darcey that he believed the black mailer was a person who was in the law-enforcement profession.

29.     During their initial meeting about the black mailer, Duncan also told Darcey it was his belief that the black mailer was, or was working with, someone who would be running against him in the election for Chisago County Sheriff.

30.     Duncan was uniquely positioned as the chief law-enforcement officer serving Darcey and her family to repeatedly violate her constitutional rights.  He had no subordinates who could get in his way.  And she had no one in law enforcement to turn to and question him.

31.     At one point after this initial meeting, when Sheriff Duncan's black mailer scheme was further along, Darcey told him that she saw a vehicle outside her home and was worried it could be the black mailer.  She gave Duncan the license plate number.  Duncan had someone at the Chisago County Sheriff's Office run the license plate and told Darcey everything came back fine.

32.     Duncan regularly used his Chisago County-issued cell phone to communicate with Darcey in order to propagate his scheme.

33.     Duncan instilled terrifying levels of fear and panic in Darcey.  She internalized these feelings and believed him throughout the entire course of his constitutional misconduct.

34.     He told her if the black mailer's demands were not followed the black mailer would kill Darcey and her family.  At that time her two children were ages 2 and 7.  Darcey believed there was a such a criminal out there.

35.     During their first meeting, Duncan told Darcey the black mailer "hacked" his iPad and could see everything that was recorded on that device. Darcey believed him because he was the Sheriff.

36.     According to Duncan, the black mailer would require video evidence of compliance with affair-related demands to keep their families safe.

37.     He told her during their initial meeting that he would keep her safe because he was the Sheriff.  Duncan used statements like—"I'm the Sheriff.  I will protect you" and "I will keep you safe.  I'm the Sheriff"—repeatedly throughout the course of his egregious and intentional constitutional misconduct in this case.

38.     Duncan told Darcey during their initial meeting that she could not tell anyone about this issue, including his brother/her husband.

39.      Duncan showed her the note that he had fabricated as evidence of a crime and then left her house.  But Duncan told Darcey they should go along with the demands so that Duncan could locate and arrest the criminal.  Darcey remained in grave fear for herself and her family.  Her life would never be the same.

6

40.     A second visit from Duncan to Darcey occurred later in April or early in May of 2017.  Duncan told Darcey he had received another letter from the black mailer.

41.     He showed her the letter.  It directed her to spank him as he was laying on her lap.  Believing compliance was necessary for her safety and that of her family, Darcey complied.  Duncan pulled down his uniform pants and his underwear and recorded Darcey spanking him.

42.     Duncan told Darcey that he had sent the letters in his possession to the Minneapolis Police Department to check for fingerprints, which yielded nothing.

43.     The next letter Duncan wrote as the black mailer required her to wear a pair of underwear for a day and then give the underwear to him to take to work at his Chisago County office.  He would then be required to record himself smelling the underwear.  Darcey also complied with this demand and the two of them watched the video together at a later date.

44.     The next letter Duncan fabricated as evidence of criminal activity required him to insert his county-issued baton into his anus while recording it on his iPad.  And he required Darcey to watch the video, which the two of them did.

45.     Duncan's scheme continued over the ensuing months.

7

46.     In early June 2017, he was scheduled to attend a Sheriff's Conference with Chisago County's funds.  Duncan told Darcey the next letter he received mandated that she attend the Sheriff's Conference with him from June 4-6, 2017, at Cragun's Resort in Brainerd, MN.

47.     Darcey complied by driving to meet Duncan in Cambridge, Minnesota.  He had a number of demand letters that he had fabricated as evidence of criminal activity.  Duncan was in full uniform and drove them to Brainerd in an unmarked Chisago County squad car.

48.     The following demands were contained in the letters and were met by Darcey, with most (or all) of them recorded on Duncan's iPad on the way to, or upon arrival at, Cragun's:

- They were to kiss each other for two minutes;

- They were to fondle each other's private parts for around five minutes;

- Darcey was to take off her shirt and allow Duncan to rub and suck on her breasts;

- Duncan was to perform oral sex on Darcey until she had an orgasm; and

93054113.1

- Darcey was to perform oral sex on Duncan until he ejaculated while he drove.  He told her it was okay to take off her seatbelt because he was a cop.

49.     Darcey complied with all of these demands, causing her unthinkable distress, humiliation, and shame.  At the same time, she was terrified about the safety of her family while she was gone.

50.     The Sheriff was uniquely situated to further his pattern of constitutional misconduct by requiring attendance at the Minnesota Sheriff's Conference because he was *the* Sheriff.

51.     Within hours of arriving at the conference, Darcey received a text message from her husband saying he was sick and asking that she come home.

52.     She told Duncan this news, and he decided to fabricate communications with the black mailer allowing Darcey to go home in exchange for compliance with future demands.

53.     Duncan then fabricated more evidence and continued his serial violations of Darcey's constitutional rights by writing one more demand letter that he relayed to her.

54.     This time they were required to have sexual intercourse and anal sex.  Duncan told Darcey the letter provided that compliance would end the entire ordeal.

9

55.    He also told her if she chose not to comply with the requirements he would still "*try* to protect" her.

56.    Darcey drove to Duncan's home in Chisago County. She complied with Duncan's scheme by having sexual intercourse with him. She recorded it on his iPad. But she refused to comply with the demand for anal sex. She chose to accept the possibility of death instead. Duncan then fabricated more communications with the black mailer, and told Darcey they could be done.

57.    Throughout the course of his constitutional violations against Darcey, Sheriff Duncan was using his position as Sheriff to purportedly investigate and apprehend a third-party criminal.

58.    Duncan's response to her questions about "who" was often that he was doing his best to protect her and keep her safe. Darcey asked Duncan about going to the police – someone other than him – but Duncan told her he suspected it was an inside job by virtue of his title.

59.    At all times material herein, Sheriff Duncan was the Chisago County official with final decisionmaking and policymaking authority in the areas of law enforcement. That included preventing crime, investigating crime, evidence collection/analysis in connection with criminal investigations, and arresting criminals for potential prosecution.

60.     During his pattern of repeated constitutional misconduct in this case, Sheriff Duncan acted within the authority vested in him by Chisago County.

61.     Sheriff Duncan abused his power in a way that no lower-level law enforcement official could.  He repeatedly assured Darcey that he could protect her because he was the Sheriff.  He told her that he believed the perpetrator to be one of his political rivals.  He told her that he had taken steps to investigate the black mailer.  He also told her that he was keeping an eye on everyone within the Chisago County Sheriff's Office as potential suspects.

62.     As the chief law-enforcement official for Chisago County, Sheriff Duncan knew that the scheme he was perpetrating involved purported criminal activity by a third-party.  This was the universe in which Duncan operated in order terrorize Darcey.

63.     Sheriff Duncan knew that potential crimes chargeable against this supposed third-party could include the following:

- Harassment under Minn. Stat. § 609.749, subd. 2;

- Stalking under Minn. Stat. § 609.749, subd. 5; and

- Threats of Violence under Minn. Stat. § 609.713, subd. 1.

93054113.1

64.     With the authority granted to him by Chisago County, Sheriff Duncan was uniquely capable of pulling off these repeated acts of sexual assault and misconduct.

65.     At all times material herein, the Chisago County Sheriff's Office provided a full range of law-enforcement services for the citizens of Chisago County, including Darcey.

66.     At all times material herein, the Chisago County Sheriff's Office provided contracted police services to the citizens of Stacy, including Darcey.

67.     At all times material herein, Sheriff Duncan had jurisdiction to investigate crimes anywhere in Chisago County, even in cities with established police forces.  But, as a citizen of Stacy, Darcey had only the Chisago County Sheriff's Office to investigate and aid in the prevention and prosecution of criminal activity.

68.     Minnesota sheriffs have responsibility for enforcing laws throughout their county and it is their duty to take initiative in enforcement of the laws without waiting for complaints.  *Op. Atty. Gen.* 733, July 14, 1947.

69.     Minnesota Statutes § 387.03 addresses the powers and duties of Minnesota county Sheriffs, including Duncan.  It states, in part:  "The sheriff shall keep and preserve the peace of the county, for which purpose the sheriff

93054113.1

may require the aid of such persons or power of the county as the sheriff deems necessary."

70.   Darcey deferred to Duncan's analysis on how to solve this black mail crisis.

71.    After Duncan retired as Sheriff in May 2018, there were no more demand letters.

72.   But prior to his retirement, Sheriff Duncan, as he did with Darcey, acted under color of state law to violate Jacobson's constitutional rights.

73.   In October-November 2017, Duncan engaged in a pattern of fabricating evidence of criminal activity to coerce Chisago County employee Jacobson into a sexual relationship with him.

74.   At his December 15, 2020 deposition in Jacobson's civil case, Duncan testified his intent was:  "[T]o try to create a situation that I would eventually be able to solve."

75.   It can reasonably be inferred, given the pattern and similarity of the misconduct, that he had the same intent with Darcey.  And "solving" was one of the areas in which he had authorized decisionmaking and final policymaking authority for Chisago County.

76.   As he previously did with Darcey, he used his authority as the Sheriff to propagate his scheme with Jacobson.

93054113.1

77.     Sheriff Duncan told Jacobson he had received mail from someone called the "Control Freak."  Of course, Duncan ended up being the author of these and other messages to Jacobson.

78.     Duncan communicated with Jacobson by letter, text and email to further his constitutional misconduct against her.  He engaged in similar misconduct under color of state law against Darcey.

79.     Duncan told Jacobson he had at least one of the letters analyzed for fingerprints.

80.     The communications relayed to Jacobson threatened the safety of her children.  A letter Duncan had fabricated demanded that she spend three days in a hotel with him during a law enforcement "training."  Duncan implored Jacobson to go along with the Control Freak's demand because he was concerned for her family's safety.  And, also like Darcey, Jacobson was told not to tell anyone.

81.     Jacobson would not agree to go along with Sheriff Duncan, and on November 20, 2017 she reported the events to her employer, Chisago County.

82.     Defendant Duncan was ultimately charged with criminal activity against both victims—Jacobson and Darcey.

83.     In a civil lawsuit brought by Jacobson against Duncan and Chisago County, this Court held that Duncan acted under color of state law and violated

14

Jacobson's constitutional right to equal protection.  *Jacobson v. County of Chisago*, 2021 WL 2982739, at *11 (D. Minn. 2021).

84.     On March 4, 2022, a civil jury in this Court awarded Jacobson $1,115,000 in damages.

85.     Darcey suffered in silence for a long time as a result of these events. Her life was unmanageable.

86.     In April 2018, she sought treatment and counseling with Marnie Harper ("Harper"), MS LMFT at Family Based Therapy Associates.  This treatment continued for several months.

87.     Darcey reported relationship difficulties with her husband.  There was tremendous strain on that relationship due to the sexual assaults by Sheriff Duncan that she was still keeping secret.  She did not want to discuss the abuse with Harper.

88.     Darcey reported to Harper that she obtained an order for protection against her husband and that her husband was suicidal.

89.     Later, during another course of treatment with Harper, Darcey reported the sexual assaults by Duncan (who she referred to as a "family member") and tried to explore how much she was damaged as a result.

93054113.1

90.    Darcey told Harper she felt guilt and shame regarding the incidents. Her life was a mess with excessive worrying, hopelessness, sleep difficulties and hypervigilance, among other things.

91.    She continued treating with Harper over several months.  Her concerns included decreased sexual interest in her husband after the assaults. She reported feeling as though she cheated on him.

92.    Then, on May 14, 2021, she told Harper that she informed her husband of the sexual assaults a couple days prior.

93.    This was an unspeakably difficult time for Darcey.  She returned to treatment with Harper in September 2022 after a prolonged period away from it.

94.    On October 4, 2022, she visited Harper because she was unable to work or function due to her mental-health issues.  It seemed as though Darcey may have previously been underreporting her symptoms to Harper.  Darcey was diagnosed with Post-Traumatic Stress Disorder as a result of Duncan's conduct.

95.    Her daily life and mental health are still grievously affected as a direct and proximate result of constitutional misconduct by Defendants Duncan and Chisago County.

## COUNT I:  42 U.S.C. § 1983—FOURTEENTH AMENDMENT VIOLATIONS AGAINST RICHARD DUNCAN IN HIS INDIVIDUAL CAPACITY

96.    Darcey realleges each allegation contained in the above paragraphs as if fully set forth herein.

93054113.1

97.    In 2017, Darcey had a clearly established due-process constitutional right to be free from rape, sexual assault and physical assault by a state actor like Defendant Duncan.

98.    Defendant Duncan intentionally violated Darcey's right not to be deprived of her bodily integrity without due process of law by fabricating evidence as part of a putative criminal investigation to coerce Darcey into having repeated and unwanted sexual contact with him.

99.    Defendant Duncan's conduct was so egregious and so outrageous that it may fairly be said to shock the contemporary conscience.

100.    Defendant Duncan subjected Darcey to these deprivations intentionally and maliciously.

101.    As a direct and proximate result of Defendant Duncan's acts, Darcey suffered severe and persistent mental anguish, shame, humiliation, embarrassment, degradation and other types of bodily and mental harm compensable under 42 U.S.C. § 1983.

102.    Darcey has and will incur medical expenses, wage loss, loss of economic opportunity and lost value of working time as a direct and proximate result of Defendant Duncan's misconduct.

103.    Darcey suffered compensatory damages in an amount to be determined by a jury.

93054113.1

104.    Punitive damages are available against Defendant Duncan and are hereby claimed as a matter of right under federal common law and *Smith v. Wade*, 461 U.S. 30 (1983).

105.    Darcey is entitled to recover her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

### COUNT II:  42 U.S.C. § 1983 – MONELL V. DEP'T OF SOCIAL SERVICES AGAINST DEFENDANT DUNCAN IN HIS OFFICIAL CAPACITY AND DEFENDANT CHISAGO COUNTY

106.    Darcey realleges each allegation contained in the above paragraphs as if fully set forth herein.

107.    "Proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably." *Board of County Com'rs v. Brown*, 520 U.S. 397, 405 (1997).

108.    "Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains." *Id.*

109.    Defendant Duncan was, at all times material herein, an authorized decisionmaker and a final policymaker for Defendant Chisago County.

93054113.1

110.    The misconduct at issue in this case was within the sphere of his decisionmaking and policymaking authority.

111.    In fact, Defendant Duncan alone was Defendant Chisago County's final decisionmaking and policymaking authority on the issues of preventing crime, investigating crime, evidence collection/analysis in connection with criminal investigations and arresting criminals for potential prosecution.  His intentional misconduct against Darcey occurred via a sham criminal investigation he created.

112.    Defendant Duncan's misconduct represents official county policy and liability attaches to Chisago County under 42 U.S.C. § 1983 and *Monell* for its Sheriff's decisions to take unlawful action.  This policy was the moving force behind the violation of Darcey's due-process right to bodily integrity.

113.    As a direct and proximate result of the Defendants' unconstitutional acts, Darcey suffered and continues to suffer severe and persistent mental anguish, shame, humiliation, embarrassment, degradation and other types of bodily and mental harm compensable under 42 U.S.C. § 1983.

114.    Darcey has and will incur medical expenses, wage loss, loss of economic opportunity and lost value of working time as a direct and proximate result of Defendant Chisago County's misconduct.

93054113.1

115.    Darcey suffered compensatory damages in an amount to be determined by a jury.

116.    Darcey is entitled to recover her costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Darcey Duncan prays for judgment against Defendants as follows:

1.      That this Court find that Defendants Duncan and Chisago County committed acts and omissions violating the United States Constitution, actionable under 42 U.S.C. § 1983;

2.      As to Count One, a money judgment against Defendant Duncan for compensatory and punitive damages in an amount to be determined by a jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and pre-judgment interest;

3.      As to Count Two, a money judgment against Defendant Chisago County for compensatory damages in an amount to be determined by a jury, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and pre-judgment interest; and

4.      For such other and further relief as this Court deems just and equitable.

93054113.1

Dated:  March 16, 2023        **ROBINS KAPLAN LLP**


*s/Andrew J. Noel*
Robert Bennett, #6713
Andrew J. Noel, #0322118
Kathryn H. Bennett, #0392087
Marc E. Betinsky, #0388414
Greta Wiessner, #0401130
800 LaSalle Ave, Suite 2800
Minneapolis, MN 55402
Telephone:  612-349-8500
rbennett@robinskaplan.com
anoel@robinskaplan.com
kbennett@robinskaplan.com
mbetinsky@robinskaplan.com
gwiessner@robinskaplan.com
***Attorneys for Plaintiff***

93054113.1