UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Darcey Duncan, | Case No. 23-CV-646 (KMM/EMB) |
| Plaintiff, | |
| v. | **ORDER** |
| Richard Duncan, in his individual capacity as Chisago County Sheriff; and Chisago County, | |
| Defendants. | |

This case arises out of Defendant Richard Duncan's (Duncan) conduct while he served as the Chisago County Sheriff, which involved the fabrication of a crime that he used to sexually abuse Plaintiff Darcey Duncan ("Darcey" or "Plaintiff"). Darcey sued Duncan and Defendant Chisago County under 42 U.S.C. §§ 1983 and 1988, alleging that Duncan's conduct violated her constitutional rights.

Before the Court are Darcey and the County's cross-motions for summary judgment on the following issues: (1) whether Duncan was acting "under color of state law" when he committed the misconduct, as required for a Section 1983 claim; (2) whether the County is liable for Duncan's misconduct under *Monell*; and (3) the admissibility of the expert testimony of two federal law enforcement officers, which the County submits on the issue of *Monell* liability. (Dkt. Nos. 91 (Darcey), 97 (County).)

For the reasons discussed below, the Court grants Darcey's Motion for Partial

1

Summary Judgment and denies the County's Motion for Summary Judgment.[1]

## BACKGROUND

The following facts are largely undisputed. During the relevant period, Duncan served as the Chisago County Sheriff, a position he was elected to in 2010. (Dkt. No. 94-1 ("Duncan Dep.") at 5.) In that role, Duncan was responsible for "keep[ing] and preserv[ing] the peace of the county"—including by "pursu[ing] and apprehend[ing] all felons"—and had wide discretion to procure the resources he "deem[ed] necessary" to do so. Minn. Stat. § 387.03. To that end, Duncan was "responsible for drafting, approving, and[] adopting sheriff's office policies regarding law enforcement in Chisago County," which also meant setting the department's investigative and law-enforcement priorities. (Duncan Dep. at 9–10.) As the County's chief law enforcement officer, Duncan's decision-making related to those duties was final. (Dkt. No. 94-6 ("Kirchner Dep.") at 20–21.)

Around April 2017, Duncan texted Darcey, his sister-in-law, from his work phone, asking to meet at her home to discuss "something important." (Duncan Dep. at 11; Dkt. No. 94-5 ("Darcey Dep.") at 15.) Prior to this, Duncan and Darcey were "not close" and had only seen each other at occasional family gatherings. (Duncan Dep. at 22–23.)

A few days later, Duncan arrived at Darcey's home in his squad car, wearing his uniform and service weapon, and told Darcey that he was investigating a blackmail crime targeting them. (*Id.* at 50; Darcey Dep. at 15–16.) Duncan said that he had received a letter

---

[1] Darcey's motion is partial because she seeks summary judgment as to liability on her substantive claims but does not seek summary judgment as to damages.

2

threatening harm to both their families unless they had an affair. (Darcey Dep. at 16; Duncan Dep. at 18.) He showed Darcey the letter, which he had written but claimed was from an anonymous criminal. The letter contained immediate demands that Darcey and Duncan perform specified sexual acts. Throughout the scheme, Duncan told Darcey he believed that the blackmailer was a political rival within the department. (Dkt. No. 101-3 at 12.) When, according to Duncan, Darcey seemed "anxious" and "afraid for her family," Duncan assured her, "As the sheriff, I'll protect your family. Don't worry about it." (Duncan Dep. at 18.) Darcey testified that she believed Duncan's scheme and his promises of protection "[b]ecause he was the sheriff" who was "supposed to protect everyone," including his family and the community. (Darcey Dep. at 18.)

Starting that day, and for the next few months, Duncan coerced Darcey into performing various sexual acts with him by fabricating additional letters and maintaining that the blackmailer demanded they do so. (*See* Dkt. No. 94-11 at 2.) At times, Duncan told Darcey that the blackmailer ordered them to record their sexual acts, to watch sexually explicit videos together, and for Darcey to record Duncan performing sexual acts alone, all on his county-issued iPad. (Dkt. No. 94-3 at 3; Dkt No. 94-4 at 7.) According to Duncan, their interactions were "always" during his work hours. (Duncan Dep. at 49.) At one point, Duncan told Darcey that the blackmailer instructed her to accompany Duncan to a sheriff's conference and to record herself performing sexual acts with him on the way there. (Dkt. No. 94-4 at 7–8; Darcey Dep. at 16.)

To maintain the scheme, Duncan continually invoked his authority as the sheriff, telling Darcey that he was investigating the crime by running fingerprints and license

3

plates. (Duncan Dep. at 19.) Only in June 2017, when Darcey responded to one of the sexual demands by saying she would "rather die" and refusing to comply, did Duncan end the scheme, telling Darcey that the blackmailer had no more demands. (*Id.*; Darcey Dep. at 40; *see* Dkt. No. 94-11 at 2.) Still, Duncan told Darcey that the blackmailer continued to pose a risk to her safety and that Duncan would protect Darcey and her family, even after he had stepped down as the county sheriff.[2] (Duncan Dep. at 24–25.)

In October and November 2017, Duncan attempted to perpetrate the same scheme on a county employee by fabricating blackmail letters addressed to her, much like the ones he used to sexually coerce Darcey. (Kirchner Dep. at 16.) After Duncan tried convincing the employee to attend a work conference with him, the employee reported Duncan to human resources, which triggered a suspicion that Duncan was the blackmailer and a subsequent investigation. (*Id.* at 16–17.) The investigation revealed that Duncan's actions violated "the standard of conduct expected of" him as the county sheriff. (*Id.* at 27–28.) As he did here, Duncan pleaded guilty to the criminal charges brought for his conduct against the employee.

In 2021, Darcey reported Duncan to law enforcement, and Duncan later pleaded guilty to criminal charges for his abuse of her. (*See* Dkt. No. 94-19 at 5; *see generally* Dkt. No. 94-11 (Petition to Enter Plea of Guilty).) Then, in 2023, Darcey filed this civil action against Duncan and the County under 42 U.S.C. §§ 1983 and 1988, alleging that Duncan's conduct violated her due-process rights to bodily privacy and integrity under the Fourteenth

---

[2] Duncan resigned from his position in May 2018. (Duncan Dep. at 5.)

Amendment and that the County was liable under *Monell*. (Dkt. No. 60, ¶¶ 150–51, 165–66.)

## DISCUSSION

Darcey seeks summary judgment on all of her claims against Duncan and the County. (Dkt. No. 93 at 1–2.) Specifically, as to her Section 1983 claim against Duncan, Darcey argues there is no dispute that Duncan was acting "under color of law" when he sexually abused her. As to her claim against the County, Darcey argues that, for purposes of *Monell* liability, Duncan was a final policymaker for the County sheriff's department and that he acted within the scope of that policymaking authority when he sexually abused her. (*Id.*) In its cross-motion, the County argues that it is entitled to summary judgment because the undisputed facts show that Duncan was not acting under color of law, which would be fatal to Darcey's Section 1983 claim. Alternatively, the County argues that *Monell* liability cannot attach because Duncan was not a final policymaker for the County and, even if he was, he was not acting within the scope of his policymaking authority when he committed the misconduct. The parties also disagree over the admissibility of expert testimony by two federal law enforcement officers, which the County submits in support of its argument that Duncan was not a final policymaker.

Each issue is discussed in turn, beginning with the threshold question of whether Duncan acted under color of law when he sexually abused Darcey through his fabricated blackmail scheme.

5

## I. Legal Standard

Summary judgment is only proper if there is "no genuine dispute as to any material fact . . . and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those "that might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is a "genuine dispute" if a reasonable jury could find in favor of the nonmovant. *Id.* In determining whether summary judgment is proper, courts must view the evidence, and any reasonable inferences that can be drawn from the evidence, in the light most favorable to the non-moving party. *TCF Nat'l Bank v. Mkt. Intel., Inc.*, 812 F.3d 701, 707 (8th Cir. 2016). Beyond that, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Anderson*, 477 U.S. at 255.

Relevant here, "the filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact[.]" *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983). If the parties' motions "suggest[] that . . . conflicting inferences as to a material fact may reasonably be drawn from the materials before the court," summary judgment must be denied. *Id.*

## II. Fourteenth Amendment Claim (Count I) Under 42 U.S.C. § 1983

Section 1983 "imposes liability for certain actions taken 'under color of' law that deprive a person of" a constitutional right. *See Dossett v. First State Bank*, 399 F.3d 940, 947 (8th Cir. 2005). Whether a violation of Darcey's rights occurred presents a threshold question because a valid claim against Duncan is necessary before the County can

6

potentially be liable for Duncan's conduct. *See Rusness v. Becker County*, 31 F.4th 606, 617 (8th Cir. 2022) (stating that a "constitutional violation is a threshold issue for a *Monell* claim to move forward"); *Aldridge v. City of St. Louis*, 75 F.4th 895, 901 (8th Cir. 2023) (noting the "general rule that, in order for municipal liability to attach, individual liability first must be found on an underlying substantive claim").

At the outset, it is undisputed that, if Duncan acted under color of law, his sexual exploitation of Darcey violated her due-process rights. In a substantive "due process challenge to abusive conduct by a state actor," the "question . . . is 'whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Rogers v. City of Little Rock*, 152 F.3d 790, 797 (8th Cir. 1998) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)). If this standard is met, "[a] sexual assault can be a constitutional violation under section 1983." *Haberthur v. City of Raymore*, 119 F.3d 720, 723 (8th Cir. 1997) (noting that a constitutional injury resulting from "egregious sexual contact" by a state actor is "a violation of the substantive due process right to bodily integrity or privacy"). Here, Duncan intentionally created a blackmail scheme designed to make Darcey, whom he knew to be anxious and "vulnerable," believe that she and her family members would be harmed if she refused to engage in numerous sexual acts with Duncan. (Duncan Dep. at 18–20.) And Duncan maintained the scheme for months, knowing that he was able to victimize Darcey in large part because he was the county sheriff. (*Id.* at 24.) As in *Rogers*, Duncan's conduct was "an exercise of power without any legitimate governmental objective" that "falls at the extreme end of the scale of egregious conduct by a state actor." 152 F.3d at 797. Because

7

the facts material to this question are not genuinely disputed, the Court concludes, as a matter of law, that Duncan's conduct violated Darcey's constitutional rights.

The closer question is whether Duncan acted under color of state law when he abused Darcey. The Court finds that he did. "Generally speaking, a public employee acts under color of law when he 'exercise[s] power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law[.]'" *Johnson v. Phillips*, 664 F.3d 232, 239–40 (8th Cir. 2011) (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988)) (alteration in *Johnson*). "The element is satisfied if the defendant acts or purports to act in the performance of official duties, even if he oversteps his authority and misuses power." *Id.*; *see also Ramirez-Peyro v. Holder*, 574 F.3d 893, 900 (8th Cir. 2009) (stating the "firmly established" rule that "a public official acts under color of law when that official 'abuses the position given to him by the State'" (quoting *West*, 487 U.S. at 49–50 (1988))). Stated otherwise, there must be "a sufficient nexus . . . between the official's public position and the official's harmful conduct." *Ramirez-Peyro*, 574 F.3d at 900 (citation omitted). This "fact intensive" inquiry "includes considerations such as whether the officers are on duty and in uniform, the motivation behind the officers' actions, and whether the officers had access to the victim because of their positions[.]" *Id.* at 901.

From their initial meeting, when Duncan first told Darcey about the blackmailer, Duncan always appeared in uniform, in his squad car, and during his work hours. (Duncan Dep. at 49–50; Darcey Dep. at 15–16.) Prior to that, he had never been to Darcey's home in his uniform. (Duncan Dep. at 23.) Moreover, Duncan testified that he "used the tools that came along with being the sheriff to carry out [his] scheme" and, as noted earlier,

8

believed that he was able to do so because he was the sheriff. (*Id.* at 23–24.) Duncan relied on his position throughout the scheme, purporting to exercise his authority as the sheriff to investigate the crime and "protect" Darcey. (*Id.* at 19.) And because Duncan was the sheriff, he knew Darcey had nowhere else to turn to report the blackmail.

Duncan's motivation was also tied to his position. *See Ramirez-Peyro*, 574 F.3d at 901. Duncan created the scheme in part because he "found the administrative nature of [his] work as Sheriff of Chisago County mundane and wanted to feel a sense of heroism from doing police work like investigating and solving a crime." (Dkt. No. 94-2 at 2–4.) According to Duncan, the "excitement" of "creating . . . an environment [where] something . . . could be investigated" was his primary motivation. (*See* Duncan Dep. at 11–12.) Moreover, Duncan pleaded guilty to misconduct of a public officer (Dkt. No. 94-10 at 5; Dkt No. 94-11), which criminalizes an officer who acts in their official capacity "knowing it is in excess of lawful authority or knowing it is forbidden by law to be done in that capacity." Minn. Stat. § 609.43(2); *see Jacobson v. County of Chisago*, No. 18-cv-2528 (SRN/HB), 2021 WL 2982739, at *11 (D. Minn. July 15, 2021) (considering guilty plea for same charge in under-color-of-state-law analysis).[3] Given the undisputed facts, no reasonable jury could find that Duncan was not acting under color of state law when he sexually coerced Darcey. *See Anderson*, 477 U.S. at 248.

---

[3] The Court's conclusion here, reached independently, is consistent with the district court's determination in the *Jacobson* case that Duncan was acting under color of state law when he attempted to perpetrate a near-identical scheme on the employee. *Jacobson*, 2021 WL 2982739, at *11. The order cited here is from the civil suit that the county employee filed against Duncan and the County.

9

To be clear, the Court's conclusion does not imply that a sheriff or law enforcement officers are always acting under color of law merely because the nature of their jobs lend towards the assumption that "are always on the clock." (*See* Dkt. No. 99 at 16–17 (quoting *Lindke v. Freed*, 601 U.S. 187, 196 (2024)).) The law recognizes that "acts of officers in the ambit of their personal pursuits" fall outside the purview of Section 1983. *Lindke*, 601 U.S. at 196 (quoting *Screws v. United States*, 325 U.S. 91, 111 (1945)). But that is not the case here, where Duncan "purport[ed] to act in the performance of official duties," and his conduct so clearly "was made possible only because [he was] clothed with the authority of state law." *Johnson*, 664 F.3d at 239–40.

### III. County's Liability Under *Monell* (Count II)

Having concluded that Darcey has established a viable Section 1983 claim against Duncan, the Court turns next to whether the County can be held liable under *Monell* for the conduct giving rise to that claim. Darcey argues that the County is liable as a matter of law because the undisputed facts establish that Duncan, as the county sheriff, was a final policymaker who acted within the scope of that policymaking authority when he violated Darcey's constitutional rights. (Dkt. No. 93 at 14–15.) On the other hand, the County argues for a narrower application of the final-policymaker theory of liability. (Dkt. No. 99 at 16.) Under the County's proposed approach, *Monell* liability cannot attach to Duncan's actions because Duncan lacked final policymaking authority over the sheriff department's sexual misconduct policy, and Duncan could not have been acting within the scope of that authority if his conduct violated an existing department policy. (Dkt. No. 115 at 14–16.)

Typically, "a local government may not be sued under § 1983 for an injury inflicted solely by its employees[.]" *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). However, a government entity may be responsible for the injury "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* Even a "single decision by a municipal authority can . . . constitute official policy" for purposes of *Monell* liability. *Bolderson v. City of Wentzville*, 840 F.3d 982, 985 (8th Cir. 2016) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986)). In this context, a policy is "a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Stockley v. Joyce*, 963 F.3d 809, 823–24 (8th Cir. 2020). That authority is localized. "The fact that a[n] . . . official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Id.* at 985–86 (quotations omitted).

"[W]hether an official had final policymaking authority is a question of state law." *Pembaur*, 475 U.S. at 483. Courts "look to applicable state and local law to determine where final policymaking authority rests." *Bolderson*, 840 F.3d at 985. Here, applicable state law effectively provides that the county sheriff is the highest-ranking official over matters of law enforcement. Under state law, the county sheriff "shall keep and preserve the peace of the county" and "pursue and apprehend all felons." *See* Minn. Stat. § 387.03.

Against this backdrop and viewing the undisputed facts in the light most favorable to the County, *TCF Nat'l Bank*, 812 F.3d at 707, the Court concludes as a matter of law

11

that Duncan was a final policymaker with respect to the department's law-enforcement objectives and environment. As the county sheriff, Duncan had the authority to "require the aid of such persons or power of the county as [he] deem[ed] necessary" to achieve those objectives. *See id.* That authority—to establish the sheriff's department's law-enforcement objectives and to direct personnel and resources accordingly without oversight—goes beyond mere discretion and amounts to final policymaking authority over those matters, *see Bolderson*, 840 F.3d at 985–86. Specifically, Duncan's authority encompassed his decision to create an "environment of something that could be investigated," his order that Darcey comply with his "investigation" by submitting to the blackmailer's demands and not telling anyone about what was happening, and Duncan's repeated reliance on his position as the county sheriff to promise Darcey protection. (Duncan Dep. at 12, 14, 37; Dkt. No. 94-3 at 15.)

Several county employees confirmed that Duncan had final policymaking authority. For example, a human resources employee explained that "the sheriff sets policy for how the sheriff's office investigates crimes" in a policy manual that is independent and separate from the general sheriff department manual. (Kirchner Dep. at 11–12.) According to that employee, all aspects of law enforcement, including investigations, are governed by policies set by the sheriff, who is immune from discipline for other policy violations. (*Id.* at 10–11.) The county administrator, who testified on behalf of the County, confirmed that the sheriff "ha[s] the ability to create their own policies" on "anything related to" law enforcement, which is binding on all department staff. (*Id.* at 3, 12, 14.)

The County argues that Duncan was not a final policymaker because he "did not have final policymaking authority to make rape the policy of Chisago County." (Dkt. No. 99 at 21–23; *see also id.* at 16–18 (arguing that Duncan's actions were purely "personal pursuits").) Although the County's position has some appeal, the Court disagrees. Of course, no official has the authority to permit rape. But more to the point, the fact that Duncan abused his power cannot necessarily mean that his misconduct, both the fabrication of the blackmail scheme and the ensuing sexual abuse, exceeded his final policymaking authority. *Whitson v. Bd. of Cnty. Comm'rs of Cnty. of Sedgwick*, 106 F.4th 1063, 1058 (10th Cir. 2024) ("[A] policymaker need not be motivated by legitimate policy goals for conduct to fall within final policymaking authority."). The County's argument cannot be reconciled with the line of cases where courts have found that *Monell* liability attached to sexual assaults committed by law enforcement officers. *See, e.g.*, *Bennett v. Pippin*, 74 F.3d 578, 586 (5th Cir. 1996) ("The fact that rape is not a legitimate law enforcement goal does not prevent the Sheriff's act from falling within his law enforcement function."); *see also id.*, 106 F.4th at 1067–70 (relying on cases involving sexual and other misconduct in reaching the same conclusion, including *Dean v. Searcey*, 893 F.3d 504 (8th Cir. 2018), and *Felts v. Green*, 91 F.4th 938 (8th Cir. 2024)). Adopting the County's position would amount to "[a] rule under which a municipality could escape liability whenever a policymaker motivated by purely personal considerations violates constitutional mandates," which "would serve to undermine rather than enhance Section 1983's purposes." *Whitson*, 106 F.4th at 1017 (quotation omitted).

This result is consistent with *Bennett v. Pippin*, which, though not binding on the Court, is instructive. 74 F.3d 578, 586 (5th Cir. 1996). There, the court held that the county was liable for the actions of a sheriff who sexually assaulted the plaintiff, the subject of a murder investigation, by "us[ing] his authority over the investigation to coerce sex with her." *Id.* at 586. In doing so, the Fifth Circuit rejected the county's argument that "the Sheriff's actions could not be County policy because they violated well-established County policy" prohibiting rape. *Id.* Relying on a case where a sheriff planted evidence and conspired to force the plaintiff to plead guilty to sham charges, the *Bennett* court explained that "[w]hen the official representing the ultimate repository of law enforcement power in the county makes a deliberate decision to abuse that power to the detriment of its citizens, county liability under section 1983 must attach, provided that the other prerequisites for finding liability under that section are satisfied." *Id.* (quoting *Turner v. Upton County*, 915 F.2d 133, 138 (5th Cir. 1990)). Similarly, here, Duncan was investigating a supposed blackmail scheme and used his authority over the investigation, which fell within his final policymaking authority over such matters, to coerce sex with Darcey. As discussed in the under-color-of-law analysis, Duncan was always in uniform, acted as though the blackmail scheme was part of his official duties, and used county resources to perpetrate his scheme.

The Court is also unpersuaded by the County's argument that Duncan cannot be a final policymaker because the blackmail scheme constituted crimes that are chargeable under federal law. (Dkt. No. 99 at 32.) The County cites no legal authority for the idea that

14

an actor is not a final policymaker under *Pembaur* if their misconduct is "reviewable"[4] in the sense that a separate authority could hold them accountable for the misconduct. (*See id.* at 32–36.) That the conduct at issue constitutes a federal or state crime or is not a crime at all is irrelevant to the final-policymaker analysis. Rather, the analysis turns on whether the actor "possess[ed] final authority to establish municipal policy with respect to the action ordered," as established by state or local law. *Bolderson*, 840 F.3d at 985.[5]

In sum, the Court concludes that Duncan was the final policymaking authority with respect to the conduct at issue in this case, and no reasonable jury could find in the County's favor on that point. Because Darcey has established a viable Section 1983 claim against

---

[4] In *Felts*, the court noted two features that make a municipal policy final policy: "whether the official's decisions are subject to significant review and whether the official is bound by policies not of their own making." 91 F.4th at 944 (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion)). In *Praprotnik*, the Court observed that "when a subordinate's decision is subject to review by the municipality's policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies." 485 U.S. at 127. Thus, the question of whether a decision (or potential policy) is subject to review appears to be one of the internal operations of the municipality itself, not whether a public official could face criminal consequences for their actions. The record contains no evidence indicating that within the County, Duncan was subordinate to any County policymaker when it came to law enforcement activities.

[5] The Court reaches this conclusion even considering the County's proffered expert testimony from two federal law enforcement officers, who opined that they could have investigated and prosecuted Duncan's actions under federal law. (*See* Dkt. No. 115 at 42–44.) Relying on the expert testimony to support its argument that Duncan was not a final policymaker, the County asks the Court to deny Darcey's motion to exclude the testimony as premature because the testimony "may be helpful to the jury if the Court determines factual questions need to be resolved." (*Id.* at 42–43.) Ultimately, the testimony from these two expert witnesses does not change the Court's conclusion that Darcey is entitled to summary judgment on her Section 1983 claim against the County. Therefore, the Court denies without prejudice Darcey's motion to exclude expert testimony as moot.

Duncan, and the County is liable under *Monell*, all that remains is a triable issue of damages.

## IV. Timeliness of Darcey's Tort Claims

Finally, the County argues that Darcey's tort claims for battery and intentional infliction of emotional distress (IIED) against Duncan are time-barred because the statute of limitations for those claims is two years.[6] (Dkt. No. 99 at 40 (citing Minn. Stat. § 541.07 (2025)).) Because the acts occurred around May and June 2017, and "[a]n intentional tort claim accrues on the date of the tortious act," the County asserts that Darcey must have brought her claims well before March 2023, when she filed her Complaint. (Dkt. No. 99 at 40.) Darcey argues that her claims are subject to the six-year statute of limitations that applies to actions based on sexual abuse and are thus timely. (Dkt. No. 118 at 21–22 (citing Minn. Stat. § 541.073 (2025)).)

Generally, under Minnesota state law, actions for battery and "other tort[s] resulting in personal injury" must be brought within two years. Minn. Stat. § 541.07. But there are exceptions. *Id.* (noting an exception under Minn. Stat. § 541.073). One such exception provides that "[a]n action for damages based on sexual abuse . . . must be commenced within six years of the alleged sexual abuse." Minn. Stat. § 541.073. Relevant here, the statute defines "sexual abuse" as "conduct described in sections 609.342." *Id.*, subd. 1(1). That conduct includes situations where "circumstances existing at the time of the act cause the complainant to have a reasonable fear of imminent great bodily harm to the complainant

---

[6] Darcey claims that the County is vicariously liable for Duncan's tortious acts.

16

or another," Minn. Stat. § 609.342, subd. 1(a), or "the actor uses coercion to accomplish the act," *id.*, subd. 1(c)(i). In short, "if the statute of limitations in Minn. Stat. § 541.073 applies to a claim, the two-year limitation in Minn. Stat. § 541.07 does not apply." *Doe 271 v. Pyfferoen*, 10 N.W.3d 496, 500 (Minn. Ct. App. 2024). For purposes of determining which of these statutes of limitations applies, an action is "based on sexual abuse when the sexual abuse serves as the foundation or provides the basis for the action." *Id.* at 501 (quotations omitted).

There is no question that Duncan's sexual abuse serves as the basis or foundation for Darcey's battery and IIED claims, and the County does not explain why the statute of limitations governing claims arising from sexual abuse is not applicable here. (*See* Dkt. No. 99 at 40.) As discussed above, Darcey's entire action turns on Duncan's violation of her constitutional right to bodily integrity and privacy, which occurred through the sexual coercion that Duncan obtained from his false scheme. *See supra* at 7. And, Darcey had "a reasonable fear of imminent great bodily harm" to her and her family at the time. Minn. Stat. § 609.342, subd. 1(a). Duncan fabricated the letters to "impl[y] [that the blackmailer] knew where [Darcey and her family] lived" and told Darcey that "if the blackmailer's demands were not followed, the blackmailer would kill Darcey and her family." *See id.* (Duncan Dep. at 17, 20; Darcey Dep. at 65–66.)

Because the six-year statute of limitations for claims arising from sexual abuse applies to Darcey's tort claims, and the acts that triggered the six-year period occurred around May or June 2017, Darcey's Complaint, which she filed in March 2023, was timely. As such, the Court need not address Darcey's alternative argument that the statute of

17

limitations was tolled by Duncan's "fraudulent concealment of his fabricated blackmail scheme." (Dkt. No. 118 at 22–23.)

## CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that:

1. Defendant Chisago County's Cross-Motion for Summary Judgment (Dkt. No. 97) is **DENIED**;

2. Plaintiff Darcey Duncan's Motion for Partial Summary Judgment (Dkt. No. 91) is **GRANTED**;

3. Darcey's Motion to Exclude Expert Testimony (Dkt. No. 91) is **DENIED WITHOUT PREJUDICE** as moot.

Date: November 3, 2025

*s/Katherine Menendez*
Katherine Menendez
United States District Judge